Filed 8/28/23; certified for partial publication 9/26/23 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, Plaintiff and Respondent, v. CHRISTOPHER ESPARZA, Defendant and Appellant. | D080703 (Super. Ct. No. SCD291717) |

APPEAL from a judgment of the Superior Court of San Diego County, Michael S. Groch and Daniel F. Link, Judges. Affirmed.

Justin Behravesh, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Collette C. Cavalier and Maxine Hart for Plaintiff and Respondent.

## INTRODUCTION

After defendant Christopher Esparza was pulled over for a Vehicle Code violation, a detective who specializes in gang enforcement recognized him and two of his passengers as members of a City Heights gang. The detective thought Delfino Osnaya, one of the passengers, was likely to be armed and told the other officers they needed to search him. After their patdown of Osnaya yielded a loaded gun, the officers searched Esparza as well and found another loaded weapon.

Esparza contests the constitutional validity of his detention and search, arguing (1) the officers lacked reasonable suspicion that *he* was armed and dangerous when they conducted his patdown, and (2) his detention was unreasonably prolonged because it lasted longer than necessary for the officers to issue him a citation for the Vehicle Code violation. As we explain, however, the detention lasted a mere seven minutes, during which the officers proceeded expeditiously consistent with reasonable concerns for officer safety. The totality of the circumstances known to the initial investigating officer justified those concerns, which were only heightened as additional factors came to light during the course of the traffic stop. Esparza also raises an issue regarding his probation conditions that we conclude was properly resolved by the trial court. Accordingly, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Early on a September evening, Esparza was driving a car with three other occupants inside. He was pulled over by San Diego Police Department Officers Arreola and Vina for having darkly tinted windows, in violation of Vehicle Code section 26708, subdivision (a). Although this violation enabled the officers to lawfully detain the vehicle, their true interest was in policing gang activity around the City Heights neighborhood. Arreola and Vina were

2

working collaboratively with detectives from the Street Gang Unit; Detective Patrick from that unit asked them to stop this particular car for having excessively tinted windows. The car was traveling through an area known by the detectives to be contested gang territory claimed by both the City Heights Juniors[1] and Eastside San Diego.

After Arreola flashed his lights and activated his siren, Esparza pulled into an alleyway and rolled down his window. Arreola got out of his vehicle, took cover behind a wooden utility pole, and asked for all windows in the car to be rolled down. When the remaining windows were lowered, Arreola approached the driver's side of the vehicle and called for backup as Vina approached the passenger's side. After seeing four people were inside the vehicle, Arreola stopped behind Esparza, facing Osyana, the passenger behind the driver's seat. Arreola immediately asked Osnaya for identification, instructed Esparza to turn off the engine, and then requested Esparza's license. Vina stayed on the other side of the car talking to Eduardo Yescas, the front seat passenger. The fourth person, Lorena Davila, was seated directly behind Yescas.

While he waited for Esparza to produce his license, Arreola questioned Osnaya and took down his identifying information on a notepad. He inquired about Osnaya's arrest history, to which Osnaya responded that he had been arrested in Nevada for possession of a controlled substance. Arreola then asked to see Osnaya's hands.

At that point, the first of three distinct rounds of backup arrived. When the backup officers approached the car, Arreola handed a detective both Esparza's license and the notepad with Osnaya's name and date of birth

---

[1] Also called Sur Trece, Sur Trece Juniors, and City Heights Juniors gang.

written on it, asking him to run both names and clarifying that the license belonged to the driver.[2]

Within moments, the second round of backup arrived, which included Detective Hansel from the Street Gang Unit. Hansel focused on monitoring several gangs, including the City Heights Juniors, by identifying new members, locating social media accounts, and staying up to date on individuals' parole and probation status. When Hansel walked up to the car, he immediately identified Osnaya by name, commenting that Osnaya was "always strapped." He told Arreola they needed to pat him down for weapons. Arreola reminded Osnaya to keep his hands in sight, and asked Hansel to stay with the driver of the car. When Hansel saw Esparza, he recognized him by name as well.[3] He then said they were "all" members of the City Heights gang,[4] though he seemed to only recognize Yescas in a general way.[5] He never identified or said anything specific about Davila.

---

[2] This interaction, caught on the body camera footage, seems to have been missed by both of the parties.

[3] Hansel incorrectly called him "Christian Esparza" and Esparza corrected him, clarifying that his first name was Christopher.

[4] Apparently, Hansel knew Esparza and Yescas to be documented members of the City Heights Juniors, while in his opinion, Osnaya was an "up and coming" (but not documented) member. The record is not clear on Davila's alleged affiliation with the gang, or what Hansel may or may not have known about her.

[5] The video shows Hansel identifying Osnaya and Esparza by name, saying they are "all City Heights," and then gesturing at Yescas as he says, "I don't remember him I.D." Hansel has an audible European accent and occasionally drops an article or uses an unconventional word to express an idea in English. We take this phrase to mean Hansel recognized Yescas generally as a City Heights Juniors' member but could not remember his

When the third round of backup officers arrived, two of them assisted Arreola in getting Osnaya out of the car and conducting a patdown search for weapons. They found a loaded ghost gun in his waistband and subsequently decided to patdown the car's other occupants.[6] The search of Esparza yielded another loaded gun. Osnaya and Esparza were both arrested. All told, the time between when Arreola and Vina initially approached the car and Esparza's arrest was about seven minutes.

Esparza and Osnaya were charged as codefendants, and although this appeal concerns only Esparza's case, the underlying proceedings we review here were conducted jointly—including a motion to suppress evidence under Penal Code section 1538.5.[7] The defense's theory was that the officers unduly prolonged the detention and lacked reasonable suspicion to conduct a warrantless search of Osnaya and Esparza. As a result, they argued, all evidence recovered during and after the patdowns should be suppressed.

The motion to suppress was heard in conjunction with the preliminary hearing, where Hansel, Arreola, and Vina all testified. After considering the testimony, the court determined that there was "a very significant officer safety component" to the stop that justified Arreola and Vina staying with the car and waiting for backup to arrive before running Esparza's license. It commented that Arreola's desire to wait for several additional officers to arrive (which he had explained during his testimony) might indeed be necessary to ensure safety, given that the car had four occupants. The court

---

name in the moment. Hansel later testified that he generally recognized Yescas.

[6] A ghost gun lacks a serial number, which can be an indicator that it was not legally obtained.

[7] All further undesignated statutory references are to the Penal Code.

further clarified that Arreola's interest in and questioning of Osnaya was not unlawful given that he was waiting for backup anyway. As to whether the stop was unduly prolonged, the court found it important that the period between the initial stop and the patdown of Osnaya was about three and a half minutes. The judge went on to say that, although time is not the sole indicator of whether a detention was prolonged, "one would expect that even issuing a traffic citation for tinted windows, by the time the officer goes back [to their car], calls it in, looks at the DMV record, writes up the ticket, is way longer than three and a half minutes."

In addressing the alleged lack of reasonable suspicion preceding Osnaya's patdown, the court found that "everything changed the minute Detective Hansel arrived on the scene and immediately said you have to search this guy. He's known to have guns or known to have weapons." It further explained that Hansel's knowledge of and communication to the other officers of the threat posed by Osnaya potentially being armed "would give reasonable suspicion . . . for the officer to then do a patdown [of all the occupants] for all of their safety" before proceeding with the citation. For these reasons, the court denied the defense's suppression motion.

Following the preliminary hearing, the defense renewed their suppression motion and, in conjunction, filed a section 995 motion arguing the information should be dismissed because the court erroneously denied the motion to suppress. After reviewing the preliminary hearing transcript, watching Arreola's body worn camera footage (BWC), and hearing arguments, the court denied the motions. It put particular weight on that fact that pretextual stops are permissible (within the bounds set by the lawful reason for the stop), that there was a "reasonable call for back-up for safety due to four people in the car," and that Hansel's knowledge justified

6

the patdown of Osnaya—which in turn justified searching the other occupants of the car for weapons before completing the Vehicle Code citation.

## DISCUSSION

### A. *Esparza's detention and patdown search were lawful.*

On appeal, Esparza resurrects the same arguments advanced below: (1) the officers lacked reasonable suspicion that he was armed and dangerous when they conducted his patdown, and, in any event, (2) the detention lasted too long because the traffic stop went beyond what was necessary for the officers to issue him a citation for tinted windows. As we explain below, neither contention has merit.

The foundations for our analysis trace back to the watershed criminal procedure decision in *Terry v. Ohio* (1968) 392 U.S. 1 (*Terry*). In *Terry,* the Supreme Court held that when a police officer harbors reasonable suspicion that "criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous," an investigatory detention and patdown search for weapons is constitutionally permissible under the Fourth Amendment. (*Terry*, at p. 30.) Reasonable suspicion is less than probable cause (*United States v. Arvizu* (2002) 534 U.S. 266, 274 (*Arvizu*)), but is more than a mere "hunch," and must be based on "specific reasonable inferences which [officers are] entitled to draw from the facts in light of [their] experience[s]." (*Terry,* at p. 27). Whether reasonable suspicion exists depends on the totality of the circumstances. (*United States v. Cortez* (1981) 449 U.S. 411, 417 (*Cortez*).)

As to our standard of review, we give deference to any factual findings made at the preliminary hearing, and independently evaluate the legal

7

questions of whether the detention and search were reasonable. (*Blakes v. Superior Court* (2021) 72 Cal.App.5th 904, 910.)

1. *The totality of the circumstances demonstrates that searching Esparza for weapons was reasonable.*

As an initial matter, the traffic stop was legal since the tinted windows constituted a Vehicle Code violation. (See *People v. Superior Court of Los Angeles County* (1972) 7 Cal.3d 186, 200.) The trial court found as much, and Esparza raises no argument to the contrary.

Esparza's assertion that the officers lacked reasonable suspicion applies primarily to the patdown search of his person, and rests on a careful parsing of the information known to officers when they decided to conduct the patdown, as if each factor stood alone. He further emphasizes his calm conduct and agreeable demeanor during the traffic stop, plus the absence of any contraband in the car immediately visible to the officers. We cannot, however, focus on what was missing from this encounter, nor can we isolate each component in analyzing a *Terry* stop; instead, we evaluate the factors that *were* present, as part of the whole picture, to decide whether they gave rise to reasonable suspicion.

By the time officers conducted the patdown search of Esparza, they had already gathered a considerable amount of specific information. Esparza had been identified by a veteran gang detective as an established gang member who was driving a car with (at least) two other gang members.[8] At the moment of the traffic stop, he was driving through contested territory claimed by both his gang and a rival group. Each of the gangs were known

---

[8] There is, perhaps, some nuance here as Osnaya was identified by Hansel as an "up and coming" (rather than already documented) gang member.

for violent activity. A ghost gun with a magazine of ammunition had just been found on one of his passengers.[9] Given that "consideration of the modes or patterns of operation of certain kinds of lawbreakers" is a permissible point of reference from which a "trained officer [can] draw[ ] inferences and make[ ] deductions" (*Cortez, supra,* 449 U.S. at p. 418), there was enough here to reasonably infer that Esparza may have been armed and dangerous in that moment. To say otherwise would be tantamount to undermining all of the specialized knowledge about gang operations gathered by investigators who are deeply immersed in tracking such activity and would impermissibly shrink *Terry* stop analysis to an artificially confined scope.

Esparza's argument attempts to pick these factors apart, pointing out that presence in an area of increased gang activity is not *alone* sufficient to justify a weapons search. (*In re H.M.* (2008) 167 Cal.App.4th 136, 146 (*H.M.*); see also *People v. Medina* (2003) 110 Cal.App.4th 171, 177–178 (*Medina*).) He also suggests that mere membership in a gang, without more, does not provide reasonable suspicion to patdown an individual. (See *Spivey v. Rocha* (9th Cir. 1999) 194 F.3d 971, 978.) But looking at "factors in isolation from each other does not take into account the 'totality of the circumstances.' " Instead, it employs a segmented analysis that *Terry* precludes. (*Arvizu, supra,* 534 U.S. at p. 274.)

---

[9]     That Esparza was driving the car in which Osnaya was a passenger is a compelling aspect of this contextual analysis. They were not merely standing on the same street corner. (See *People v. Samples* (1996) 48 Cal. App. 4th 1197, 1212 [The fact that defendant was driving a car with two passengers who were subjects of a search warrant indicated "an apparent close physical and functional association" between them that, in addition to other factors, justified the defendant's detention and patdown.].)

Tellingly, none of the cases cited by Esparza utilize such an approach. At most, they merely demonstrate that one factor alone is usually not enough to support reasonable suspicion. In *H.M.*, an officer's patdown search of a juvenile was deemed lawful due to a confluence of four factors, including the juvenile's presence in an area "known for gang activity," which the Court of Appeal found to be "an especially significant factor demonstrating the officer had reasonable suspicion to stop and frisk." (*H.M.*, *supra*, 167 Cal.App.4th at pp. 144–146.) In contrast, *Medina* involved an unlawful *Terry* stop because it was "based solely on [the appellant's] presence in a high crime area late at night," and lacked any individualized factors. (*Medina*, *supra*, 110 Cal.App.4th at pp. 171, 178.) *Spivey* is even further afield. The portion of the opinion Esparza relies on is a discussion of a trial court's decision to exclude the alleged gang affiliations of both a murder and an assault victim from their attacker's trial, since the information was "not probative to the question of whether [the victims] were armed" on the day of the crime. (*Spivey*, *supra*, 194 F.3d at p. 978.) Unsurprisingly, this discretionary decision was affirmed. (*Id*. at p. 979.)

In distinguishing the cases Esparza cites, we do not suggest that mere gang affiliation of one individual can, alone, justify a stop and frisk; it is clear it does not. (*People v. Hester* (2004) 119 Cal.App.4th 376, 392.) We are cognizant, also, that the " 'high crime area' " justification for a detention can be easily abused (*In re Tony C*. (1978) 21 Cal.3d 888, 897), as can an individual's mere proximity to someone suspected of criminal activity. (See *Ybarra v. Illinois* (1979) 444 U.S. 85, 91.) But when such factors are all stacked together, as was this case here, the analysis changes. (Compare with the lesser factors present in *Santos v. Superior Court* (1984) 154 Cal.App.3d 1178, 1185 [that defendant was spotted "standing with two men in a closed

10

off area of the parking lot" where the two other men "exchanged something" and defendant had no identification on him did not amount to reasonable suspicion he was armed and dangerous].)  We also emphasize that the recovery of Osnaya's gun was a particularly important factor in the officers' decision to patdown Esparza.  In our view, the addition of this final factor surely gave rise to a reasonable inference that the other gang members in the car might be armed and dangerous.

Contrary to his assertion, Esparza's calm demeanor in this context was not enough to allay the officers' legitimate safety concerns.  "That appellant's posture, at that moment, was nonthreatening does not in any measure diminish the potential for sudden armed violence that his presence within the [car] suggested.  To require an officer to await an overt act of hostility, as appellant suggests, before attempting to neutralize the threat of physical harm which accompanies an occupant's presence in a [seemingly dangerous setting] would be utter folly." (*People v. Thurman* (1989) 209 Cal.App.3d 817, 823.)

> 2.  *Esparza's detention was not unduly prolonged.*

Esparza's second argument focuses on the length of his detention, asserting it was unduly prolonged because it went beyond the officers' only necessary tasks:  to run his license and then issue him a citation for tinted windows.  After conducting a thorough review of how the traffic stop proceeded, we are convinced that at each juncture the officers acted within the bounds of the law.  Any delay that resulted from Arreola's decision to wait for backup was reasonable in light of his justifiable safety concerns.  As a result, the brief investigation of Osnaya that took place in the interim did not prolong the detention.

11

To explain why the length of the detention was reasonable, we begin with a review of the relevant law as it evolved after the *Terry* decision. *(Terry, supra,* 392 U.S. 1.)  In the wake of *Terry*, the Supreme Court has grappled with, clarified, and ultimately expanded the contours of warrantless stops and searches by teasing out the following pertinent principles.  Most vehicle stops are "analogous to a so-called '*Terry* stop.' "  (*Berkemer v. McCarty* (1984) 468 U.S. 420, 439.)  When a car is lawfully detained, "police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." (*Pennsylvania v. Mimms* (1977) 434 U.S. 106, 111, fn. 6.)  Passengers are seized in traffic stops in the same manner as drivers (*Brendlin v. California* (2007) 551 U.S. 249, 263), and the threat posed to an officer by a passenger is "every bit as great as that of the driver" such that officers may therefore "order passengers to get out of the car pending completion of the stop." (*Maryland v. Wilson* (1997) 519 U.S. 408, 414–415.)  Pretextual stops are tolerated—so long as the lawful bounds that justify the stop are observed— because the subjective intent of officers is irrelevant in Fourth Amendment analysis.  (*Whren v. U.S.* (1996) 517 U.S. 806, 814 (*Whren*).)  Finally, investigations conducted by officers not directly related to the initial purpose of the stop "do not convert the encounter into something other than a lawful seizure, so long as the inquiries do not measurably extend the stop's duration."  (*Arizona v. Johnson* (2009) 555 U.S. 323, 333.)

In arguing he was detained too long, Esparza makes much of the pretextual nature of the stop and the officers' apparent focus on Osnaya throughout.  We agree that the initial detention seems to have been

12

motivated by something other than the Vehicle Code violation.[10]  But that does not make it unlawful.  (*Whren, supra,* 517 U.S. at p. 813; see also *Scott v. United States* (1978), 436 U.S. 128, 138.)  A pretextual stop only ripens into an unlawful detention if it deviates too far from the proper legal justification, which is to "address the traffic violation that warranted the stop"—what the Court has called the "mission" of the stop—and "attend to related safety concerns."  (*Rodriguez v. United States*, 575 U.S. 348, 354 (*Rodriguez*).)  Aside from directly addressing the traffic violation, the "officer's mission" also "includes 'ordinary inquiries incident to [the traffic] stop' [citation] . . . . [such as] checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance."  (*Id.* at 355.)

But that does not mean, as Esparza implies, that each action an officer takes during a traffic stop must be directly related to the mission or to evaluating safety.  Rather, "[t]he Fourth Amendment tolerate[s] certain unrelated investigations that [do] not lengthen the roadside detention," giving the officer leeway to "conduct certain unrelated checks during an otherwise lawful traffic stop."  (*Rodriguez, supra,* 575 U.S. at pp. 354–355.)  Accordingly, the question here is whether Esparza's detention was unduly prolonged *in order to* accommodate the officers' investigation of something that fell outside the mission of the stop or attending to related safety concerns.  It is with this question in mind that we review Arreola's conduct.

---

[10]    The officers were certainly interested in something else.  The record is unclear as to what made Detective Patrick flag Esparza's car to pull over, but given that he asked Arreola and Vina to cite Esparza for a Vehicle Code violation during a period where they were conducting a joint operation between the gang unit and patrol officers, we can reasonably infer something potentially related to gang activity caught his attention.

Throughout the course of the BWC video, Arreola is visible taking actions that are consistent with the safety concerns he highlighted at the preliminary hearing. When he initially leaves his patrol car, at timestamp 2:03, he walks behind a broad wooden utility pole while instructing Esparza's car to lower all windows. This makes sense as a safety precaution because the windows were tinted dark enough that it is not possible to see inside. By timestamp 2:17, the windows are all down, at which point Arreola proceeds to the driver's side of the car while Vina covers the passenger side. Arreola simultaneously calls for backup, and at timestamp 2:22, he steps to the side of Osnaya seated in the backseat on the driver's side.



From the camera angle, it is clear he positioned himself so he could see as much of the inside of the car as possible from one place.

14

This is consistent with his testimony about why he stood by Osnaya during the stop. When asked about his positioning at the preliminary hearing, he answered, "I stayed with Osnaya for the most part because I didn't have a cover officer and then I would have a better vantage point on the driver, to view the driver. [¶] As soon as I would get a cover officer, then I can push up and contact the driver and then someone else could stay with the [ ] passenger." Later, when Hansel arrived in the second wave of backup officers, Arreola did indeed ask Hansel to stay with the driver while he stayed with Osnaya, ensuring that at least one officer was observing each of them.

His concern for safety continued to be apparent in the roughly two-minute period where Arreola was waiting for the first round of backup. He spent this time questioning Osnaya, and when Osnaya disclosed he was previously arrested for possession of a controlled substance, Arreola asked to see Osnaya's hands—a request consistent with his stated safety concerns.

When the first round of backup arrived and a detective walked up to assist him,[11] Arreola gave him both Esparza's license and the notepad paper with Osnaya's name and date of birth on it. He asked the detective to "run those two," explaining that Osnaya had no identification on him.[12]

Again, Arreola's actions here comport with his testimony. When asked why he did not go back to run Esparza's license as soon as Esparza produced it, Arreola answered, "I didn't go back and do the [records] check because,

---

[11]    This might have been Detective Short, but his identity is unclear.

[12]    As we mentioned earlier, this moment seems to have been missed by both of the parties. Esparza argues that when the first round of backup arrived, Arreola had enough cover to leave the car and run Esparza's license. That he indeed asked another officer to do just that demonstrates he acted as soon as it was safe to move the mission of the traffic stop forward.

again, there wasn't enough officers that would be on the driver's side. We would need at least two officers per each occupant for me to go back and do that records check."

Detective Hansel arrived within moments with the second wave of backup. By timestamp 5:24, he recognizes Osnaya and alerts Arreola that they need to pat him down because he believes Osnaya is "always strapped." Arreola immediately approaches a bit closer to the car and asks Osnaya to put his hands on the back of the driver's seat so they remain visible. After Osnaya complies, Arreola requests that Hansel to stay with the driver, who Hansel recognizes as Esparza. Arreola then asks Hansel if any other units are coming—another indicator that Arreola is both concerned for safety and waiting for further backup before removing Osnaya from the car.

Within less than a minute, around timestamp 6:19, more backup arrives and Arreola calls another detective over to help him with Osnaya's patdown. At timestamp 6:38, Arreola identifies the gun in Osnaya's waistband and a third officer comes over to help Arreola handcuff Osnaya. The other officer then removes the gun. Arreola does a quick patdown for other weapons before walking the handcuffed Osnaya to a police car. Other officers then patdown Esparza, who is no longer visible on Arreola's video.

All told, the video demonstrates that Arreola was focused on three things simultaneously: completing the mission of the stop (which included the "ordinary inquiry" of checking Esparza's license), ensuring officer safety, and conducting additional questioning of Osnaya while he waited for backup. Significantly, this collateral questioning did not *extend* the length of the detention, given the officer safety concerns at play.

16

Moreover, we are convinced that safety concerns were the actual reason that Arreola waited for backup to arrive, both before running Esparza's license and before conducting Osnaya's patdown. It was not a mere after-the-fact justification. This distinction is important given the Court's commentary in *Rodriguez* that a police officer's legitimate safety interest "stems from the mission of the stop itself." (575 U.S. at p. 356.) *Rodriguez* recognized that, although traffic stops are " 'especially fraught with danger to police officers,' " pretextual safety measures that relate solely to "[o]n-scene investigation into other crimes" would exceed constitutional limits. (*Ibid.*) In other words, an actual concern for officer safety matters—and we are satisfied that it existed here.

It is of particular significance that the judge who conducted the preliminary hearing came to the same conclusion. Although he did not make an explicit finding that Arreola's testimony was credible, he commented on some of the same moments in the video that we do, reflecting a consistency between Arreola's testimony and his actions during the stop. Insofar as this can reasonably be characterized as a credibility finding uniquely within the purview of the court that observed Arreola's testimony, we extend deference to such conclusions, which lend further support to our result.

Finally, we address Esparza's reliance on *People v. McGaughran* (1979) 25 Cal.3d 577, 581 (*McGaughran*), which is distinguishable on the facts alone. In that case, an officer stopped a car for driving the wrong way on a one-way street, and then detained the car for over a half hour while he checked for warrants, called for backup, and rechecked the warrants. He spent a significant portion of that time sitting in his car alone without displaying the kind of concern for officer safety present in this case. In contrast, the total time between the initial detention of Esparza's car and

17

his patdown search was about seven minutes. As discussed above, Arreola continued to move the mission of the stop forward in that period while simultaneously attending to legitimate safety considerations.[13] For these reasons, *McGaughran* presented a different scenario altogether.[14]

We therefore conclude that Esparza's detention was not unreasonably extended, either prior to Osnaya's patdown or afterward. The stop was initiated lawfully and remained lawful throughout. As a result, Esparza's

---

[13] Esparza points out that he was never issued a citation for tinted windows and argues that this demonstrates the true reason for the stop overtook the lawful mission. But because we conclude that each step in the detention and search was lawful, we agree with the court's commentary on this point: "I'm not taking much in terms of weight from the fact that they never ultimately issued a citation because if nobody in the car had a gun or drugs or anything else of contraband, then one presumes they would have either gotten a citation, at least the driver, or been warned. Once it got to the level of felonies, then it seems a little silly to [say] oh, here's your ticket, too."

[14] It is perhaps of additional interest here that a key reason for the court's decision in *McGaughran* hinged on a distinction that is no longer relevant: whether the type of violation committed by the driver—and witnessed by the officer—enabled the officer to make an arrest. (*McGaughran, supra,* 25 Cal.3d at p. 583.) This was based on the state *statutory* authority at issue. In the years since *McGaughran,* both "the Supreme Court of the United States and California have determined the [F]ourth [A]mendment is not violated if an officer places a motorist in custody for a traffic offense committed in his or her presence, [and as such], a significant factor in *McGaughran,* that the officer could not have placed the defendant in custody for driving the wrong way on a one-way street, is now questionable." (Caskey, Cal. Search & Seizure (2023) Extended or prolonged detention; *Rodriguez, McGaughran,* § 4:24; see also *Atwater v. City of Lago Vista* (2001) 532 U.S. 318, 354 ["If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."]; *People v. McKay* (2002) 27 Cal.4th 601, 607 ["[T]here is nothing inherently unconstitutional about effecting a custodial arrest for a fine-only offense."].)

motion to suppress evidence was properly denied, as was his subsequent section 995 motion based on the same argument.

B.  *The trial court did not misunderstand its discretion in imposing probation conditions, nor are the conditions unreasonable under* Lent.

Esparza also raises a secondary issue, claiming that the judge who sentenced him misunderstood his discretion in crafting one of Esparza's probation conditions.  Alternately, he contends that the condition is invalid under the test established by *People v. Lent* (1975) 15 Cal.3d 481 (*Lent*).  To the contrary, we conclude that the court understood its discretion, and that the probation condition complies with *Lent*.

After exhausting the available opportunities to suppress the gun and ammunition recovered from his patdown search, Esparza pleaded guilty to three counts of firearm-related offenses.  (§§ 29800, subd. (a)(1), 25850, subd. (c), 30305, subd. (a)(1).)  He was sentenced to 90 days in an alternative custody program and two years of formal probation, which included a gang condition 12c that prevents him from visiting schools.  Specifically, the condition directs him to "not knowingly visit/frequent any school grounds unless you are a student registered at the school," and gives his probation officer the discretion to modify the terms.

As his sentencing hearing, Esparza's counsel asked for an exception to this condition, explaining that Esparza helped pick up his nephew from school.  The People did not object to this limited carve out, and the judge then took a moment to ask Esparza about his family arrangement:

19

"The Court:  Who is it that you are picking up?

The Defendant:  My little nephew.

The Court:  What's his name?

The Defendant:  David.

The Court:  What's his last name?

The Defendant:  I don't know."

Immediately after this exchange, the court imposed the probation conditions, including staying one of Esparza's fines and striking electronics and computers from the warrantless search condition.  The court did not, however, modify the school grounds condition.  It specifically said it was imposing the condition "fully," and when Esparza's attorney inquired to clarify that the judge was not making an exception for Esparza to pick up his nephew, he replied, "I'm not.  I wanted to, but I can't."

Esparza now claims that the trial court was unaware it had the power to modify condition 12c.  But this notion is contradicted by almost every indicator in the transcript.  The court modified other conditions, most notably by striking electronics and computers from the warrantless search provision. That the court explicitly referenced the *Lent* case when it did so does not indicate, as Esparza suggests, that it thought itself bound by *Lent, supra*, 15 Cal. 3d 481, but otherwise not free to exercise its usual degree of discretion. Following caselaw and exercising discretion are not mutually exclusive concepts.  Even the court's clarification that it was imposing condition 12c "fully" indicates that it was aware it was free to tinker with that condition and impose it partially.  Lastly, the fact that the court took the time to ask Esparza about his nephew and only then decided not to create a carve-out indicates it thought better of the exception for some reason.  If the court mistakenly believed it was prohibited from modifying the condition, its

20

inquiry into who precisely Esparza wanted to pick up from school would have made little sense.

The singular indication that supports Esparza's interpretation is the court's use of the word "can't" when it explained that it was not modifying condition 12c. But given the other indicators that the court understood it could modify this condition, it makes little sense to interpret this word literally. Even in the formal setting of a courtroom, speech is notably more flexible than writing, and we believe the court meant that the facts did not justify modifying the condition, rather than that it was precluded from doing so. Consequently, we follow the "[n]ormal[ ] . . . [presumption that] the trial court was aware of and understood the scope of its authority and discretion under the applicable law." (*Barriga v. 99 Cents Only Stores LLC* (2020) 51 Cal. App. 5th 299, 333.) There is not enough in this record to rebut that standard presumption, and indeed, most indicators support it.

We likewise conclude that the condition satisfies the requirements in *Lent, supra*, 15 Cal.3d 481. *Lent* specifies that a reviewing court will not hold a condition of probation invalid "unless it '(1) has no relationship to the crime of which the offender was convicted, (2) relates to conduct which is not in itself criminal, and (3) requires or forbids conduct which is not reasonably related to future criminality.' " (*Id*. at p. 486.) Because "[t]his test is conjunctive," we would not invalidate a condition unless "all three prongs [are] satisfied." (*People v. Moran* (2016) 1 Cal.5th 398, 403.) As such, we need only address how the condition fails to satisfy one of the three prongs.

In this case, the fact that the condition is reasonably related to preventing future criminality is enough. Esparza is a known gang member, "[s]chools . . . are 'known gang gathering areas' " (*People v. Martinez* (2014) 226 Cal.App.4th 759, 766), and access to schools at which Esparza is not a

student imposes a limited burden on him.[15]  As such, we cannot characterize the condition as unreasonable.  " '[A] reviewing court will disturb the trial court's decision to impose a particular condition of probation only if, under all the circumstances, that choice is arbitrary and capricious and is wholly unreasonable.' " (*People v. Bryant* (2021) 11 Cal.5th 976, 984.)

Esparza's relies on *In re Ricardo P.* (2019) 7 Cal.5th 1113 to argue that "there is nothing more than a hypothetical relationship between the [school] condition and any sort of future criminality."  But *Ricardo P.* gave particular consideration to the highly invasive warrantless electronic search conditions imposed on a juvenile whose crime, a burglary, did not involve the use of electronics.  (*Ricardo P.,* at p. 1116.)  The trial court's justification for the condition was to prevent the juvenile from using his electronic devices to purchase drugs—a concern which was unrelated to the crime itself.  (*Id.* at pp. 1116–1117.)  In invalidating this condition, the court weighed the "very heavy burden on privacy" against the "very limited justification" for the condition and concluded that the *disproportionality* of the burden on the juvenile, compared to the utility to the government in imposing the condition, meant the condition met *Lent*'s third prong.  (*Ricardo P.,* at p. 1124.)

Esparza seems to treat the third prong as requiring a particularized nexus to his crime, a position explicitly rejected by the court in *Ricardo P., supra,* 7 Cal.5th at page 1122 ("Requiring a nexus between the condition and the underlying offense would essentially fold *Lent*'s third prong into its first prong").  Rather, the decision hinged on whether the probation condition was a reasonable means to deter future criminality, which is an inquiry that

---

15    Moreover, school access is subject to other restrictions that curtail the public's right to stay on school grounds without a valid reason.  (*In re Joseph F.* (2000) 85 Cal.App.4th 975, 983.)

necessarily incorporates a particular concern for proportionality. (*Ricardo P.*, at p. 1122 [" 'Reasonable means are moderate, not excessive, not extreme, not demanding too much, well-balanced.' "].) We identify no extremism in the burden placed on Esparza here, compared with the government's interest in ensuring gang-involved probationers do not have unfettered access to gang gathering areas that might encourage future criminal acts.

As a final note, lest it seem that Esparza has no recourse given our decision, there is an additional layer of discretion built into the probation condition he is challenging. Condition 12c specifically allows Esparza's probation officer to modify the condition on a proper showing. Should he still want to help pick up his nephew from school, he could begin by raising the issue with his probation officer and providing evidence to support the need for his request.

DISPOSITION

The judgment is affirmed.


DATO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


IRION, J.

23

Filed 9/26/23

CERTIFIED FOR PARTIAL PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>CHRISTOPHER ESPARZA,<br><br>　　Defendant and Appellant. | D080703<br><br>(Super. Ct. No. SCD291717)<br><br>ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION |

THE COURT:

The court on its own motion orders this opinion, filed on August 28, 2023, modified as follows:

1. Change the word "patdown" to "pat down" in this opinion on the following pages:

    a. On the second sentence of the first paragraph of page 5, so the sentence reads:

> They found a loaded ghost gun in his waistband and subsequently decided to pat down the car's other occupants.

    b. On the second sentence of the first full paragraph of page 9, so the sentence reads:

He also suggests that mere membership in a gang, without more, does not provide reasonable suspicion to pat down an individual.

    c.  The first full sentence at the top of page 11, so the sentence reads:

We also emphasize that the recovery of Osnaya's gun was a particularly important factor in the officers' decision to pat down Esparza.

    d.  The last sentence of the second full paragraph on page 16, so that the sentence reads:

Other officers then pat down Esparza, who is no longer visible on Arreola's video.

2.  On the last paragraph and last sentence of page 6 and ending on page 7, the words "that fact" shall be modified to "the fact," so the sentence reads:

It put particular weight on the fact that pretextual stops are permissible (within the bounds set by the lawful reason for the stop), that there was a "reasonable call for back-up for safety due to four people in the car," and that Hansel's knowledge justified the patdown of Osnaya—which in turn justified searching the other occupants of the car for weapons before completing the Vehicle Code citation.

3.  On page 9, third sentence of the top paragraph, delete the word "of" between the words "all of the specialized knowledge," so that the sentence reads:

To say otherwise would be tantamount to undermining all the specialized knowledge about

2

gang operations gathered by investigators who are deeply immersed in tracking such activity and would impermissibly shrink *Terry* stop analysis to an artificially confined scope.

4. On the first full paragraph and fourth sentence of page 16 beginning with "After Osnaya complies," delete the word "to" between "Hansel to stay," so that the sentence reads:

> After Osnaya complies, Arreola requests that Hansel stay with the driver, who Hansel recognizes as Esparza.

FURTHER, this opinion was not certified for publication. It appearing the opinion meets the standards for partial publication, except part B of the discussion, specified in California Rules of Court, rule 8.1100, the request pursuant to rule 8.1120(a) for partial publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

IT IS ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be partially published, except part B of the discussion, in the Official Reports.

O'ROURKE, Acting P.J

cc: All Parties

3